**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BARBARA MULLEN AND STACY PENNING, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PARKINGMD, INC.,<br><br>Defendant. | C.A. No.:<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

P. Bradford deLeeuw (DE Bar #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
Email: brad@deleeuwlaw.com

*Counsel for Plaintiffs*

OF COUNSEL:

Mark S. Reich
Christopher V. DeVivo
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com

Barbara Mullen and Stacy Penning ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant ParkingMD, Inc. ("ParkingMD" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of similarly situated individuals to address ParkingMD's unauthorized disclosure of their private data, including their sensitive health information and personally identifiable information, to unauthorized third parties.

2. Defendant operates https://parkingmd.com (the "Website"), an online telehealth service through which visitors are evaluated by physicians for disability parking placards and receive the physician-signed forms that state motor vehicle agencies require to gain disability parking permits.[1]

3. Through the Website, users can obtain information about disability parking permits and placards, including eligibility requirements, qualifying medical conditions, and state-specific application procedures; read informational blogs, guides, and frequently asked questions concerning disability parking; complete an online eligibility questionnaire through the "Qualify Now" feature by providing information about their medical conditions and mobility limitations; create and access patient accounts; obtain physician-signed documentation necessary to apply for a disability parking permit or placard.[2]

[1] *See Welcome to ParkingMD,* PARKINGMD, https://parkingmd.com/ (last visited Oct. 19, 2026).
[2] *See id.*

4. Defendant expressly represents that their health information is protected: "We adhere to strict HIPAA security requirements. Your medical records will be maintained in our HIPAA-compliant secure system. No one other than you and your doctor will have access to this information; your information is private and secure."[3]

5. However, embedded on the Website is tracking technology from third parties, including Microsoft, Pinterest, Google, Twitter, and TikTok (collectively, the "Tracking Entities," and their technology, the "Tracking Tools"). The Tracking Tools are designed to intercept users' communications with the Website and to disclose the contents of those communications to the Tracking Entities. Here, the Tracking Tools do so without users' knowledge or consent, and because of the nature of the Website, the intercepted communications include users' health-related browsing activity.

6. The Tracking Tools collect a broad range of sensitive user data, including detailed behavioral data and website interactions, such as search field inputs, questionnaire answers, and webpages viewed. This results in capturing users' health information, including disabilities and medical conditions such as arthritis, legal blindness, lung disease, cardiac condition, or any other condition affecting their ability to walk and travel. Furthermore, the Tracking Tools capture personal and persistent identifiers, including personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; and approximate geolocation information derived from IP addresses or similar signals (collectively,

[3] *See ParkingMD's HIPAA-Compliant Privacy Policy & Tele-Therapy Consent,* PARKINGMD, https://parkingmd.com/hipaa-compliance (last visited Oct. 20, 2026).

"Sensitive Information"). Each data point collected is aggregated by the Tracking Entities into comprehensive marketing profiles used to facilitate targeted advertising purchases by third-party advertisers seeking to reach specific users.

7. The Tracking Tools are active on the Website the moment a user arrives on the Website, capturing and transmitting to the Tracking Entities users' Sensitive Information before: (i) users have encountered any terms of use or privacy policy; (ii) users have had any opportunity to consent; and, (iii) even become aware of Defendant's data handling practices. By the time a user might encounter a privacy policy or terms of use, the Tracking Entities have already captured a user's Sensitive Information.

8. Plaintiffs are users of the Website who had their Sensitive Information disclosed to the Tracking Entities without their consent.

9. Accordingly, Plaintiffs have been harmed by Defendant's procurement of Tracking Entities to track and use Website users' Sensitive Information for marketing purposes, which constitutes unlawful wiretapping and an invasion of Plaintiffs' privacy.

10. Plaintiffs bring this action, and the claims set forth herein, on behalf of themselves and a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than

100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Defendant is a citizen of the State of Delaware and of the state of its principal place of business in Wilmington, Delaware. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

12. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

13. Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

14. Plaintiff Barbara Mullen is, and at all relevant times has been, a citizen of the State of California. Plaintiff Mullen accessed and used Defendant's Website while physically located in California.

15. Plaintiff Stacy Penning is, and at all relevant times has been, a citizen of the State of California. Plaintiff Mullen accessed and used Defendant's Website while physically located in California.

16. Defendant ParkingMD, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware. Defendant owns and operates the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' Experience On The Website

17. Plaintiff Mullen maintains an account with Defendant's Website. Plaintiff Mullen most recently visited the Website in or around early 2026 to check whether she qualified for a

disability parking placard. During her visit, Plaintiff Mullen clicked the "Qualify Now" feature to determine her eligibility for a disability parking placard.

18. Plaintiff Mullen engaged with the Website's "Qualify Now" feature and provided sensitive health information concerning her physical condition and mobility limitations. She disclosed that she "cannot walk more than 200 feet without difficulty" and that she suffers from "arthritis," by selecting those answers in the questionnaire. Plaintiff Mullen provided this information in connection with her effort to determine whether she qualified for a disability parking placard.

19. Plaintiff Mullen reasonably expected that her interactions with the Website, including her use of the "Qualify Now" feature and disclosure of information concerning her medical condition, mobility limitations, and potential eligibility for a disability parking placard, would remain private and confidential, and would be used solely for the purposes for which she provided such information.

20. Plaintiff Mullen did not consent to the tracking, collection, or disclosure of her Sensitive Information to unauthorized third parties.

21. Plaintiff Stacy Penning is a resident of California and maintains an account with Defendant's Website. Plaintiff Penning most recently visited the Website in or around July 2026. During his visit, Plaintiff Penning accessed the Website's "Driving Permit/Placards" section and clicked the "Qualify Now" feature to determine his eligibility for a disability parking placard.

22. Plaintiff Penning used the Website's "Driving Permit/Placards" section and its "Qualify Now" questionnaire to determine whether he qualified for a disability parking placard. In completing the questionnaire, Plaintiff Penning disclosed sensitive health information concerning his physical condition and mobility limitations, selecting answers indicating that he

"cannot walk more than 200 feet without difficulty" and that he suffers from "arthritis" that limits his movement.

23. Plaintiff Penning reasonably expected that his interactions with the Website, including his use of the "Driving Permit/Placards" section and "Qualify Now" feature and disclosure of information concerning his medical condition, mobility limitations, and potential eligibility for a disability parking placard, would remain private and confidential and would be used solely for the purposes for which he provided such information.

24. Plaintiff Penning did not consent to the tracking, collection, or disclosure of his Sensitive Information to unauthorized third parties.

## II. How Websites Function

25. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

26. When a user navigates to a webpage by entering a URL directly or clicking a hyperlink, that user's browser contacts a Domain Name System ("DNS") server, which translates the website's web address into a unique Internet Protocol ("IP") address.[4]

27. An IP address is "a unique address that identifies a device on the Internet or a local network."[5]

28. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

---

[4] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Oct. 19, 2026).

[5] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Oct. 19, 2026).

29. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

30. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

31. Website owners and web developers write and manage the URLs for their websites.

32. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is processed by the browser as it arrives[6] and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[7]

33. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[8] Such code is used, among other things, to monitor and report users' activity. This code intercepts users'

---

[6] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the Page: How Browsers Work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Oct. 19, 2026).

[7] *See What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Oct. 19, 2026).

[8] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Oct. 19, 2026).

communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

34. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Identify and Track Users

35. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both the Defendant and the Tracking Entities.

36. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for, or even hover over.

37. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party

cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

38. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

39. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

40. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

41. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiffs, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

42. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. Defendant's Website Uses Tracking Tools

43. The Tracking Tools function by intercepting users' communications, including Plaintiffs' Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, answer a question, or load any page on the Website.

44. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiffs, when they visit the Website. The cookies allow the Tracking Entities to identify users, including the Plaintiffs, when they visit the Website or any other website where the Tracking Tools are present.

45. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiffs' Sensitive Information. Defendant uses Plaintiffs' Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiffs' Sensitive Information for marketing and advertising on the Website and other third-party websites, to improve their own services, and to build personal profiles to advertise to users, including Plaintiffs.

## V. Microsoft UET

46. Microsoft offers Microsoft Advertising (formerly known as "Bing Ads"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[9]

47. One of the software tools available through Microsoft Advertising is Universal Event Tracking ("UET"), which allows website owners, like Defendant, to allow Microsoft to track conversion events on a website, target specific audiences, and automate advertisement

[9] *See Bing Ads API Overview*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Oct. 19, 2026).

bidding.[10] Defendant uses the information collected by UET to maximize the performance of the advertising on the Website.[11]

48. UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[12]

49. UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a globally unique ID assigned to a visitor's browser that identifies them,[13] the _uetsid cookie, which contains a session ID, and the _uetvid cookie, which contains a unique ID for a unique website visitor.[14]

50. UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every HTTP request from UET. UET can also collect:

- Event actions
- Event categories
- Event types
- Browser language setting
- Page URLs
- Referrer URLs
- Screen height

---

[10] *What Is UET and How Can It Help Me?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Oct. 19, 2026).
[11] *See id.*
[12] *See id.*
[13] *See Cookies*, MICROSOFT, https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies (last visited Oct. 19, 2026).
[14] *See FAQ: Universal Event Tracking*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Oct. 19, 2026).

- Session ID
- The UET tag ID
- A signed-in user's ID
- A visitor ID[15]

51. Information collected by Microsoft UET is used to build custom audiences. Audiences are created by segmenting users by personal characteristics and interests. Advertisers like the Defendant then use these groups to improve and target their advertising.[16]

52. These audiences can be shared between advertisers that use Microsoft UET, allowing advertisers to track users between websites across the internet.[17]

53. Microsoft uses the data collected by Microsoft UET for its own purposes. Microsoft claims ownership over all information collected by its customers and uses it to deliver Microsoft Advertising and improve its own services.[18]

54. Defendant's use of UET on the Website is shown in the figures below:

---

[15] *See id.*
[16] *See Universal Event Tracking*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13 (last visited Oct. 19, 2026).
[17] *See id.*
[18] *See Microsoft Advertising Agreement*, MICROSOFT, https://help.ads.microsoft.com/Resources/Microsoft_Advertising_Agreement_Online_Terms_v.2026-09-01/en-us.pdf (last visited Oct. 19, 2026).




*Figure 1 – UET tracking users' communications on the Website*




*Figure 2 – Content intercepted by UET tracking users' communications on the Website*




*Figure 3 – Cookies transmitted by UET on the Website*




*Figure 4 – UET tracking user search communications on the Website*




*Figure 5 – Content intercepted by UET tracking user search communications on the Website*




*Figure 6 – Cookies transmitted by UET on the Website when tracking user search communications*

## VI. The Pinterest Tag

55. Defendant installed a tracking pixel on its Website created by the social media site, Pinterest (the "Pinterest Tag").

56. The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take in order to later target these visitors with ads on Pinterest.[19]

57. To make use of the Pinterest Tag, a website owner must include its Pinterest tag ID in its base code.[20]

[19] *See Install the Pinterest Tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Oct. 19, 2026).

[20] *See Add the Base Code to Your Website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Oct. 20, 2026).

58. The Pinterest tag ID identifies which code needs to be sent to the user's browser to track website owner-designated data points through specified "events."[21]

59. Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[22]

60. The Pinterest Tag begins intercepting user information as soon as the Pinterest Tag loads onto users' browsers.[23]

61. Website owners, like Defendant, then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[24]

62. Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[25]

---

[21] *See Add Event Codes*, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Oct. 20, 2026).
[22] *See id.*
[23] *See Track Conversions with Pinterest Tag*, PINTEREST, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (last visited Oct. 20, 2026).
[24] *See Track Conversion Events in the API*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Oct. 20, 2026).
[25] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Oct. 20, 2026).

63. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[26]

64. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach."[27]

65. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[28]

66. The Pinterest Tag also sends the "tid" parameter, which identifies the website owner's Pinterest Tag ID.[29] Here, the "tid" parameter, found in Pinterest Tag transmissions from Defendant's site, contains Defendant's Pinterest tag ID of 2613399111446. This data is sent both when the Website receives communications and when users send communications to the Website.

67. Additionally, unless websites make use of a specific "Limited Data Processing flag," Pinterest employs this data to conduct research on Pinterest usage and to market its own services.[30]

---

[26] *See Enable Automatic Enhanced Match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Oct. 20, 2026).

[27] *Id.*

[28] *See id.*

[29] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Oct. 20, 2026).

[30] *See Limited Data Processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Oct. 20, 2026).

68. Pinterest also sends the data to its business partners and other vendors.[31] Defendant's use of the Pinterest Tag on the Website is demonstrated below:




*Figure 7 – The Pinterest Tag capturing a user's communications with the Website*

[31] *See State Privacy Law Disclosures and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Oct. 20, 2026).




*Figure 8 – Content intercepted by the Pinterest Tag capturing a user's communications with the Website*




*Figure 9 – Cookies transmitted by the Pinterest Tag on the Website*




*Figure 10 – The Pinterest Tag capturing user search communications on the Website*




*Figure 11 – Content intercepted by the Pinterest Tag capturing user search communications on the Website*




*Figure 12 – Cookies transmitted by the Pinterest Tag on the Website when capturing user search communications*

69. When a website owner applies to Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[32]

70. The Pinterest Terms further provide Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

71. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose their data practices and obtain their users' consent where required by law.[33]

72. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

## VII. Google Ads

73. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[34]

74. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's

---

[32] *See Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Oct. 20, 2026).
[33] *See id.*
[34] *See Achieve All Your Ad Goals in One Place*, GOOGLE, https://ads.google.com/home/goals/ (last visited Oct. 19, 2026).

search results; (iii) Google then allows advertisers to bid on those various keywords; (iv) the advertiser with the best Ad rank wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.[35]

75. Google Ads intercepted Plaintiffs' Website activity, as depicted below. This interception occurred through users' browsers as communications were sent and/or received on users' devices.




*Figure 13 – Google Ads capturing a user's communications with the Website*

[35] *See How to Set Up Google Ads: A Checklist*, GOOGLE (Mar. 2023) https://business.google.com/us/resources/articles/how-to-setup-google-ads-a-checklist/ (last visited Oct. 19, 2026).




*Figure 14 – Content intercepted by Google Ads capturing a user's communications with the Website*




*Figure 15 – Cookies transmitted by Google Ads on the Website*




*Figure 16 – Google Ads capturing user search communications on the Website*




*Figure 17 – Content intercepted by Google Ads capturing user search communications on the Website*




*Figure 18 – Cookies transmitted by Google Ads on the Website when capturing user search communications*

76. Google uses the NID cookie to identify users on the Website.[36] This allows them to match the intercepted communications with a specific user.

## VIII. The Twitter Pixel

77. X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

78. To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track,

[36] *See Privacy & Terms: How Google Uses Cookies*, GOOGLE, https://policies.google.com/technologies/cookies?hl=en-US (last visited Oct. 19, 2026).

implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user views a page.[37]

79. With each event, website owners like Defendant can select the user action they want Twitter to track and the parameters to describe the action being tracked.

80. Events can include viewing a page, making a purchase, adding an item to the shopping cart, adding payment information, and creating an account lead.[38]

81. Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[39]

82. As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences and improving marketing and advertising capabilities of the website and Twitter.[40]

83. Twitter admits that it shares users' Sensitive Information with third parties,[41] just as Plaintiffs' Sensitive Information was shared here.

84. Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity

---

[37] *See Conversion Tracking for Websites*, X HELP CENTER, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Oct. 20, 2026).
[38] *See id.*
[39] *See id.*
[40] *See Website Activity Custom Audiences*, X HELP CENTER, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Oct. 20, 2026).
[41] *See Privacy Policy*, X (last updated Jan. 15, 2026) https://x.com/en/privacy (last visited Oct. 19, 2026).

for users who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[42]

85. The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant. An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Twitter Pixel instantly sending communications to Twitter from users' browsers to add to its collection of user behavior:




*Figure 19 – The Twitter Pixel capturing a user's communications with the Website*

---

[42] *See Website Activity Custom Audiences*, *supra* note 40.




*Figure 20 – Content intercepted by the Twitter Pixel capturing a user's communications with the Website*



*Figure 21 – Cookies transmitted by the Twitter Pixel on the Website*



*Figure 22 – The Twitter Pixel capturing user search communications on the Website*




*Figure 23 – Content intercepted by the Twitter Pixel capturing user search communications on the Website*




*Figure 24 – Cookies transmitted by the Twitter Pixel on the Website when capturing user search communications*

86. Twitter is transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[43]

87. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").[44] But the Twitter Terms are not provided to Website users.

88. Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their website customers with legally sufficient notice that they are working with third parties to collect customer data through their website . . . and obtain legally sufficient consent from their customers for these activities."[45]

[43] *See Website Activity Custom Audiences*, *supra* note 40.
[44] *See Policies for Conversion Tracking and Custom Audiences*, X HELP CENTER, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-audiences (last visited Oct. 20, 2026).
[45] *Id.*

89. Twitter makes clear that the onus is on the Defendant to provide legally sufficient notice to share information with Twitter.[46]

90. Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[47]

91. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel and ignored Twitter's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

**IX. The TikTok Pixel**

92. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

93. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[48]

94. Defendant's TikTok Pixel ID is D6DVH93C77UBQKG7RENG and is included in transmissions sent to and from users' devices.

---

[46] *See id.*
[47] *See id.*
[48] *See generally Troubleshoot with Pixel Helper*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Oct. 19, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

95. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[49]

96. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

97. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[50]

98. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

99. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the

---

[49] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026) https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en; *Troubleshoot with Pixel Helper*, TIKTOK (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en..

[50] *About TikTok Pixel*, *supra* note 49.

Website]."[51] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[52] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[53] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[54]

100. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about millions of TikTok users to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[55]

101. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users loaded webpages, made searches, and filled out forms on the Website.

102. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[56]).

---

[51] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Oct. 19, 2026).

[52] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Oct. 19, 2026).

[53] *See Get Started With The TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Oct. 19, 2026) (benefits of using the TikTok Pixel).

[54] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Oct. 19, 2026).

[55] *See id.*

[56] *See List of Cookies*, G-STAR RAW 13 (March 2023) https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Oct. 19, 2026).

103. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[57]

104. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[58]

105. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third parties,[59] just as Plaintiffs' Sensitive Information was gathered and shared here.

106. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[60] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "often before users have a chance to accept cookies or otherwise grant consent."[61]

107. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[57] *See Get Started with the TikTok Pixel: A Small Business Guide*, *supra* note 53.

[58] *See TikTok Business Products (Data) Terms*, TIKTOK (Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Oct. 19, 2026).

[59] *See Privacy Policy*, TIKTOK (July 15, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Oct. 19, 2026).

[60] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023, 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Oct. 19, 2026).

[61] *Id.*




*Figure 25 – Using a browser's "developer tools" while visiting Defendant's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers*




*Figure 26 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

108. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show TikTok capturing users' communications on the Website:




*Figure 27 – TikTok Pixel capturing a user's communications on the Website*




*Figure 28 – Contents intercepted by the TikTok Pixel when it captures a user's communications on the Website.*




*Figure 29 – Cookies transmitted by the TikTok Pixel to and from the Website through the "Pageview" event*




*Figure 30 – TikTok Pixel tracking user search communications on the Website*




*Figure 31 – Contents intercepted by the TikTok Pixel when it captures user search communications on the Website*




*Figure 32 – Cookies transmitted by the TikTok Pixel from the Website when capturing user search communications*

109. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiffs and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs and Website visitors

110. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[62]

[62] *See TikTok Business Products (Data) Terms*, *supra* note 58.

111. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[63]

112. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[64] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

113. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[65]

114. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information.

## X. The Tracking Tools Intercepted and Disclosed Both the Contents of Plaintiffs' Communications With the Website, As Well as Their Personal Identifiers.

115. When Plaintiffs used Defendant's Website, including its "Qualify Now" questionnaire, they communicated information about their medical conditions, physical limitations, and eligibility for a disability parking placard. The Tracking Tools transmitted this information to the Tracking Entities in two ways: through the URLs of the questionnaire pages Plaintiffs visited, and through Plaintiffs' questionnaire answers themselves.

---

[63] *See id.*
[64] *Id.*
[65] *Id.*

116. The URLs transmitted to the Tracking Entities were not mere addresses. Because each questionnaire page corresponds to a specific question or response, the URL itself revealed the substance of Plaintiffs' communications. Coupled with Plaintiffs' questionnaire answers, the URLs conveyed the contents of Plaintiffs' communications with Defendant: what they asked, what they disclosed about their health, and what service they sought.

117. Each transmission also included unique ID Cookies that identified each Plaintiff individually.

118. These transmissions occurred in real time. When Plaintiffs submitted information on the Website, the Tracking Tools caused Plaintiffs' browsers to simultaneously send a duplicate of that communication to the Tracking Entities, which read or attempted to learn its contents while it was in transit.

## XI. Plaintiffs Did Not Consent to Defendant's Sharing of Their Website Activity

119. Plaintiffs were never presented with or asked to agree to the Website's Privacy Policy. The Website's Privacy Policy and HIPAA notice promised Plaintiffs that the Website would not share their private health information with third parties.

120. Given the sensitive nature of the information involved, Plaintiffs reasonably expected that their communications with the Website were confidential and would not be disclosed to the Tracking Entities.

121. Defendant did not adequately disclose its use of the Tracking Tools on the Website. Plaintiffs therefore did not, and could not, consent to the interception and disclosure of their Sensitive Information.

122. This matters because Plaintiffs' and the Class members' Sensitive Information has

concrete economic value.[66]

123. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[67]

124. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiffs' Sensitive Information to the Tracking Entities, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiffs of the ability to decide whether, when, to whom, and on what terms their Sensitive Information would be shared and/or sold.

125. Because Defendant and its third-party partners have already obtained Plaintiffs' information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiffs.

## XII. Federal Law Recognizes the Sensitivity of the Information Defendant Disclosed

126. Information about a person's physical and mental health is among the most sensitive information. Its disclosure can lead to discrimination, stigma, and denial of insurance coverage. The risk of disclosure also deters people from seeking care.

127. Federal law reflects this. Under HIPAA and its implementing Privacy Rule, a covered entity may not use or disclose protected health information ("PHI") except as the Rule

---

[66] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb lets you sell your data to AI labs for training*, AXIOS (Aug. 6, 2026) https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New wallet app lets users store their own training data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (similar) (last visited October 19, 2026.)

[67] *See* Mills, supra note 66; see also Morrone, supra note 66.

permits. It also may not use or disclose PHI for marketing without the individual's written authorization. *See* 45 C.F.R. §§ 164.502(a), 164.508(a)(3).

128. Plaintiffs do not assert a claim under HIPAA. However, HIPAA's standards are relevant because they confirm the private nature of the Sensitive Information and inform the reasonable expectations of Defendant's Website users.

129. Plaintiffs' Sensitive Information includes identifiers that link each visitor's health-related communications to that specific visitor.

130. HHS and the FTC have applied these principles to tracking technologies specifically. In July 2023, they jointly warned approximately 130 hospital systems and telehealth providers that tools such as tracking pixels and Google Analytics can disclose sensitive health information to third parties in ways largely unknown to users.[68]

131. Defendant knowingly disclosed the Sensitive Information to the Tracking Entities for its own commercial advantage.

**TOLLING**

132. The statutes of limitations applicable to Plaintiffs' and Class members' claims are tolled by Defendant's conduct and Plaintiffs' and Class members' delayed discovery of their claims.

133. As alleged above, Plaintiffs and Class members did not know and could not have known when they used the Website, Defendant was disclosing their Sensitive Information to the Tracking Entities without their consent. Plaintiffs and members of the Class could not have

---

[68] *See FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery (last visited Oct. 20, 2026).

discovered Defendant's unlawful conduct with reasonable diligence, given the highly technical nature of how the Tracking Tools operate.

134. Defendant had exclusive and superior knowledge that the Tracking Tools incorporated on its Website would disclose Plaintiffs' and Class Members' Sensitive Information to the Tracking Entities.

135. The earliest Plaintiffs and Class Members could have known about Defendant's conduct in connection with their investigation and the work done on their behalf in preparation for filing this Complaint was on or about October 16, 2026.

## **CLASS ALLEGATIONS**

136. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

137. Plaintiffs bring this class action individually and on behalf of the following Class:

> All persons in the United States who, during the Class Period, submitted information through and/or accessed pages on Defendant's Website while the Tracking Tools were installed on those pages (the "Class").

138. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who did so while located in California (the "California Subclass").

139. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

140. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

141. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

142. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant has been unjustly enriched by its conduct; and

e. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

143. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass.

Such common legal and factual questions, which do not vary between the California Subclass members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the CIPA; and

b. Whether Defendant's conduct constitutes a violation of the California Constitution.

144. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiffs are asserting claims that are typical of the Class members.

145. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

146. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiffs and the Class)

147. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

148. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

149. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

150. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

151. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

152. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

153. The Wiretap Act defines "person" to include "any individual, partnership, association, … trust, or corporation." 18 U.S.C. § 2510(6).

154. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

155. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

156. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, health-related browsing activity, and other interactions with Website features.

157. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

158. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

159. Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications, including their Sensitive Information.

160. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, disclosing Plaintiffs' health information, and associating the content of Plaintiffs' and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and the Class members on its Website.

161. Defendant intentionally used the wire or electronic communications to increase its profit margins and for financial gain.

162. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

**<u>COUNT II</u>**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

163. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

164. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

165. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or

cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

166. The Website, the Tracking Tools, and Plaintiffs' devices and browsers each qualify as a "machine, instrument, or contrivance, or … other manner" used to engage in the prohibited conduct at issue. *See* Cal. Penal Code § 631(a).

167. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transiting through or passing over any wire, line or cable or with the communications sent from or being received at any place within California.

168. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

169. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

170. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

171. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

172. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

173. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, including their sensitive health information.

174. Plaintiffs and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."

175. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information, is and would be highly offensive to a reasonable person.

176. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

**<u>COUNT IV</u>**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

177. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

178. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

179. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

180. It is unjust that Defendant retains those benefits under circumstances in which the Sensitive Information was collected and transmitted without valid consent.

181. Plaintiffs and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class Members. Equity and good conscience require restitution or disgorgement of benefits Defendant unjustly retained.

182. No remedy at law will address this harm, as monetary damages will not capture or account for the wrongful profit or benefit Defendant received from exploiting Plaintiffs' and Class Members' Sensitive Information.

## PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and the California Subclass, and certifying Plaintiffs as the representatives of the Class and the California Subclass and their counsel as Class Counsel;

b. For an order finding in favor of Plaintiffs, the Class and the California Subclass, on all counts asserted herein;

c. An award of statutory damages or penalties to the extent available;

d. An award of punitive damages to the extent available;

e. For damages in amounts to be determined by the Court and/or jury;

f. For pre-judgment interest on all amounts awarded;

g. For an order of restitution and all other forms of monetary relief;

h. An award of all reasonable attorneys' fees and costs; and

i. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 20, 2026

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
Telephone: (302) 274-2180
Facsimile: (302) 351-6905
Email: brad@deleeuwlaw.com

*Counsel for Plaintiffs*

OF COUNSEL:

Mark S. Reich
Christopher V. DeVivo
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com